L34LBUDO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   AKASH BUDHANI,

4                   Plaintiff,

5           v.                              20 Civ. 1409 (LJL)

6
    MONSTER BEVERAGE COMPANY,
7   MONSTER ENERGY COMPANY,
                                    **Oral Argument (Teleconference)**
8
                    Defendants.
9
    ------------------------------x
10                                      New York, N.Y.
                                        March 4, 2021
11                                      3:00 p.m.

12  Before:

13                      HON. LEWIS J. LIMAN,

14                                      District Judge

15
                            APPEARANCES
16
    SHEEHAN & ASSOCIATES, P.C.
17       Attorney for Plaintiff
    BY:  SPENCER SHEEHAN
18
    SHOOK, HARDY & BACON LLP
19       Attorneys for Defendants
    BY:  NAOKI STEPHEN KANEKO
20       MARC PHILLIP MILES

21

22

23

24

25

L34LBUDO

1          DEPUTY CLERK:  Couple quick things before Judge Liman

2     gets on.  First, this is a public proceeding, and members of

3     the public and press are able to access this proceeding through

4     the public dial-in number that's posted on the docket.  So

5     everyone on the line is reminded that any recording or

6     rebroadcasting of any portion of this proceeding is strictly

7     prohibited.

8          Second, I'm just going to remind counsel:  Any counsel

9     that won't be speaking on this call, please keep your phones

10    muted.  Anyone who's on the line that also won't be speaking on

11    this call, please keep your phones muted to avoid background

12    noise.  Counsel that will be speaking, I'm going to ask that

13    when you're not speaking that you keep your phone muted, and

14    then you begin speaking, to, of course, unmute your phone and

15    identify yourself each time for the benefit of the Court and

16    the court reporter.  And just remember to speak as loudly and

17    clearly and slowly as possible.  Thank you.  Judge Liman will

18    be on in just a moment.

19          THE COURT:  Good afternoon.  This is Judge Liman.

20          Are we ready to get started?

21          DEPUTY CLERK:  Yes, Judge.  We're all set.

22          THE COURT:  Great.

23          Who do I have on for the plaintiff?

24          MR. SHEEHAN:  For the plaintiff, Spencer Sheehan,

25    Sheehan & Associates, P.C.

L34LBUDO

1              Good afternoon, your Honor.

2              THE COURT:  Good afternoon, Mr. Sheehan.

3              And for the defendant, Monster?

4              MR. KANEKO:  Good afternoon, your Honor.

5              Naoki Kaneko from Shook, Hardy & Bacon, for defendant,

6    Monster.

7              MR. MILES:  Good afternoon, your Honor.

8              Marc Miles, for defendant Monster as well.

9              THE COURT:  Okay.  I just need whoever's going to be

10   speaking for Monster.

11             Who's going to be speaking for Monster?

12             MR. KANEKO:  I will, your Honor.  Naoki Kaneko.

13             THE COURT:  Okay, Mr. Kaneko.

14             So we're hear today for oral argument, the defendant's

15   motion to dismiss.  I'm going to reiterate a couple of things

16   that my courtroom deputy said to you before we get started.

17             I will hear first from defense counsel as the moving

18   party, and then I'll hear from plaintiff's counsel, and then a

19   couple minutes at the end from defense counsel if there are any

20   last-minute thoughts.  I've allocated an hour for today's

21   proceedings.  So, defense counsel should keep that in mind to

22   maybe keep their opening remarks to about 15 or 20 minutes.

23   I've read the papers, so just highlight for me the most

24   important points.

25             Before you speak, identify yourself for the record.

L34LBUDO

1    If you are not speaking, please put your phone on mute.  Each

2    side will have an opportunity to address the Court.  Please try

3    to speak loudly and clearly and slowly for the benefit of the

4    court reporter.  At the conclusion of today's proceeding, I'm

5    going to ask defense counsel to stay on the phone and to order

6    a copy of the transcript on an expedited basis.  I do not

7    expect to rule at the end of the day today, and the transcripts

8    will be helpful to me in rendering a decision.

9           With that said, let me hear first from defense

10   counsel, and then I'll hear from plaintiff's counsel.

11          MR. KANEKO:  Thank you, your Honor.  May it please the

12   Court.  Naoki Kaneko, for defendant, Monster Energy.

13          So, your Honor, this case, as you're well aware, is

14   about the labels for Espresso Monster, which, as the name

15   suggests, is a coffee beverage product.  And it is sold in a

16   can.  And just for your reference, your Honor, there's a

17   partial image of the label that is pasted in paragraph three of

18   plaintiff's second amended complaint.  But we've also attached

19   a full color copy to our request for judicial notice that was

20   filed concurrently with our motion.

21          THE COURT:  Let me interrupt you for a moment on that.

22          Is there any objection from plaintiff's counsel to me

23   taking judicial notice of that?

24          MR. SHEEHAN:  No, your Honor.  No objection.

25          THE COURT:  Please proceed.

L34LBUDO

1          MR. KANEKO:  Thank you, your Honor.  Again, Naoki

2     Kaneko, for defendant, Monster.

3          So looking at the front label of the can, which I

4     would emphasize is the only portion that plaintiff alleges he

5     relied on in purchasing the product, plaintiff has singled out

6     the words "vanilla cream" and an image of a flower while

7     essentially ignoring the rest of text and images.  And he

8     claimed somehow that he was misled into believing that the

9     products vanilla flavor came exclusively -- actually in this

10    case predominantly from vanilla beans.  On that label, if you

11    look front and center, is the name of the product, Espresso

12    Monster.  Below that front and center is the Monster logo or

13    the Monster clause, as it's referred to.  And then flanked on

14    both sides of the logo are the words "vanilla cream" on the

15    left and "triple shot" on the right.  And then at the very

16    bottom of the label you'll see pictures of a flower which

17    plaintiff has identified as a vanilla flower along with some

18    espresso beans and a cup of coffee.  But it's really the

19    vanilla cream statement along with the flower to a lesser

20    extent that plaintiff is relying on for his case.

21         Now, plaintiff claims the label -- his

22    interpretation -- is that it's false because, one, the product

23    isn't predominantly flavored by vanilla from vanilla beans.

24         THE COURT:  Let me ask you, counsel, to assume that I

25    accept the allegations of the complaint, that there is only a

L34LBUDO

| | |
|---|---|
| 1 | trace amount of vanilla from vanilla beans in the product. |
| 2 | Would you confine your argument to what message you think a |
| 3 | reasonable consumer could get from the reference to vanilla on |
| 4 | the can and whether a consumer would assume that there is more |
| 5 | than a trace amount of vanilla from vanilla beans? |
| 6 | MR. KANEKO:  Sure, your Honor. |
| 7 | That actually goes to the heart of the case.  So |
| 8 | plaintiff is saying that he saw this vanilla cream |
| 9 | representation.  And his interpretation was that the product |
| 10 | was predominantly flavored by vanilla beans.  But that's really |
| 11 | not the reality of this.  And this entire notion is really |
| 12 | belied by plaintiff's own prior pleadings in this case.  I |
| 13 | mean, in his original complaint he alleges that only one to two |
| 14 | percent of vanillin in commercial use is vanillin obtained from |
| 15 | the vanilla plant, which means that almost all vanillin has no |
| 16 | connection to the vanilla beans.  In other words, according to |
| 17 | plaintiff, what he's saying is that 98 percent of commercial |
| 18 | vanillin does not actually come from vanilla extract.  And so |
| 19 | this really undermines -- |
| 20 | THE COURT:  Is that an understanding that a reasonable |
| 21 | -- I should find that a reasonable consumer would have?  And |
| 22 | aren't you -- I understand your argument, but it seems to me |
| 23 | you're trying to have it both ways on that particular point, |
| 24 | holding a reasonable consumer to that bit of knowledge while |
| 25 | depriving the reasonable consumer of knowledge of the FDA's |

L34LBUDO

1    regulations.  But both seem to me to be bits of information

2    that I should not assume a reasonable consumer has.

3          MR. KANEKO:  Well, this situation, your Honor -- and

4    this is something that the other courts have addressed.  But

5    the reality -- you're looking at -- when consumers see this

6    product, they're buying a -- remember, it's not just a can of

7    vanilla.  We're talking about an espresso, cream and

8    vanilla-flavored product.  And so for vanilla here, we're not

9    talking about an ingredient claim.  There's no statement on the

10    can that's -- there's no representation for the reasonable

11    consumer as to what the source of that vanilla is.  What they

12    are looking at on this product --

13          THE COURT:  How do you address the flower?  Doesn't

14    that convey the vanilla bean used as an ingredient just as a

15    picture of a blueberry on packaging for a blueberry muffin

16    would, or a pride of honey or Honey Graham crackers?

17          MR. KANEKO:  I think there's a big difference there,

18    your Honor.  You're talking about a vanilla flower.  In all

19    honesty, when I saw the flower, I didn't even realize it was a

20    vanilla flower.  But when you're talking about a blueberry and

21    a muffin, I mean these are things that you can see.  And

22    blueberries, I think -- I mean, there's a case right on point

23    on that issue, where blueberry is more of an ingredient claim.

24    And the distinction here is when you're talking about vanilla,

25    the label doesn't say "vanilla beans."  It doesn't say "vanilla

L34LBUDO

extract."  It doesn't say "real vanilla" anywhere on this

label.  It says "vanilla cream."  And so we're really dealing

with a flavor versus an actual explicit ingredient claim.  When

you're talking about Graham crackers or an example like

blueberries, you know, those types of things are -- there's a

big difference between an ingredient as opposed to here, where

we're talking about just the flavoring.  And so when we're

talking about flavoring --

THE COURT:  Counsel, aren't you asking me in that

argument to assume the conclusion that you want me to draw?

Can you argue for me why I shouldn't understand from the flower

that a reasonable consumer would believe that real vanilla was

an ingredient?

MR. KANEKO:  Well, your Honor, the fact is there is

real vanilla in this product.  And plaintiff -- there's no

dispute there.  Plaintiff is conceding that.  Obviously he's

complaining that there's a de minimis level of vanilla in

there.  But the question then is -- there's real vanilla in

there, which, based on the allegation of his own complaint that

most commercial vanilla isn't sourced directly from real

vanilla beans, I mean, it makes sense that there are going to

be -- there are simply other ingredients.  There are a lot of

different sources of natural vanilla flavor.  And that's

something that Judge Stanton highlighted in his *Steele*

complaint.  I mean, the idea that -- the expectation that

L34LBUDO

1    vanilla favoring comes exclusively from vanilla beans, that's

2    just not the reality of the situation.  And plaintiff's own

3    complaint confirms that.

4              THE COURT:  Okay.  Continue.

5              MR. KANEKO:  So, again, as I mentioned, your Honor,

6    the fact is there's no representation here about vanilla beans,

7    vanilla extract, real vanilla in the product.  All we're

8    looking at is a product that states "vanilla cream" on there.

9    And that's precisely what was sold, that's precisely what was

10   received.  Plaintiff doesn't allege that the product doesn't

11   taste like vanilla.  In fact, he even says he liked the taste

12   and that he liked it for its intended use.  And that's right

13   there in his complaint.

14             So, simply put --

15             THE COURT:  Let me ask you.  The depiction of the

16   coffee bean on the can, wouldn't a reasonable consumer

17   understand that the coffee flavor in this -- and the coffee

18   affecting this product comes from a coffee bean?

19             MR. KANEKO:  I think that's right, your Honor.  I

20   mean, there's coffee in the product.  There is coffee

21   represented.  It's Espresso Monster.  So, yes, that's perfectly

22   reasonable.

23             THE COURT:  So if that is so and the bean connotes to

24   a reasonable consumer that inside this can there's something

25   that comes from that bean, wouldn't a reasonable consumer think

L34LBUDO

```
 1    that within this can there's something more than trace amounts

 2    that come from the bean that's attached to that flower?

 3         MR. KANEKO:  I think there's a distinction,

 4    your Honor, between what we're talking about, the product here.

 5    And the product here, remember, it's Espresso Monster.  It's a

 6    coffee product.  I mean, if you look at the -- for example, the

 7    beans, the cup of coffee in the images that you see at the

 8    bottom of that can.  And I would also direct you to the romance

 9    language on the left side.  Now, obviously the plaintiffs here

10    aren't focused on the side of the can, but I mean if you look

11    at the romance language itself, I mean it refers to:  We like

12    the idea so much, we traveled to Europe to create our latest

13    coffee, Espresso Monster.  Three shots of espresso blended with

14    milk and enhanced with Monster's espresso energy blend.

15         There's no references to vanilla there, your Honor.

16    So I think it's perfectly reasonable for a consumer to buy this

17    product and expect there to be more than just a de minimis

18    level of coffee, whereas here we're talking about a flavoring,

19    the vanilla cream here, I just don't -- I think there's a big

20    distinction there, your Honor.

21         THE COURT:  Isn't that the same thing that you're

22    saying to me is the primary ingredient argument that's been

23    rejected by a number of judges, including Judge Cogan

24    (phonetic) and Judge Woods, that, you know, because vanilla is

25    not the primary ingredient here, your client would be free to
```

L34LBUDO

1    lie about it?

2              MR. KANEKO:  I wouldn't say we were free to lie about

3    it, your Honor.  And the fact is, it's a true and accurate

4    statement.  There's no disagreement here that the product does

5    contain some vanilla extract or real vanilla from vanilla

6    beans.  The question here is that plaintiff is attaching this

7    added meaning that somehow vanilla cream means that the product

8    is exclusively flavored by vanilla beans.  And that's not

9    indicated or supported by anything else on the label.

10             THE COURT:  I mean, I'll hear in a moment from

11   plaintiff, but I understood a portion of their claim to be that

12   it's misleading to have just a trace amount of vanilla from

13   real vanilla beans if you're conveying the message that the

14   vanilla comes from real vanilla beans.

15             MR. KANEKO:  Your Honor, I don't think --

16             THE COURT:  Am I mistaken?

17             MR. KANEKO:  Well, I would just correct you there in

18   the sense that there is no message that the product is

19   conveying that there's actual real vanilla beans in there.

20   Again, this is really just about a flavoring claim.  And so,

21   when reasonable consumers see this product -- and this has

22   been, again, looked at by many of the judges in this district

23   -- they've --

24             THE COURT:  I mean, you keep on saying that, but your

25   product is the only one that has the flower.  So it's more

L34LBUDO

1    helpful to me if you address this on its merits rather than

2    just saying to me what other judges have done in cases that

3    don't involve the same facts as your case.

4            MR. KANEKO:  So, your Honor -- and I apologize.

5            But in the *Pichardo* case -- Judge Caproni -- that case

6    also involved a vanilla flower on the product.  And just so

7    we're on the same page, your Honor, that was a vanilla-flavored

8    protein beverage and it was labeled with the vanilla flower

9    vignette, along with the words "smooth vanilla."  Very similar

10   to the claims that we're dealing with here.

11           THE COURT:  Okay.  And how did you deal with the

12   flower?

13           MR. KANEKO:  Well, your Honor, essentially it's

14   treated the same way.  I mean, when you look at the product,

15   it's a vanilla protein beverage.  And the flower really, it's

16   the same thing.  It conveys a flavoring.  And there was no

17   dispute, again, that the product actually contained some

18   vanilla.  Now, the amount in question, obviously plaintiffs

19   were complaining it was a de minimis amount.  But, again, when

20   you look at the label, there's nothing in the label itself that

21   conveys what amount of vanilla from vanilla beans is actually

22   in the product.

23           THE COURT:  All right.  Why don't you wrap it up, and

24   then I'll hear from your adversary.

25           MR. KANEKO:  Now, there is an issue with the

L34LBUDO

```
1     artificial flavors in the product.  And plaintiff claims that
2     this product should have disclosed the presence of artificial
3     flavors.  This should be rejected for several reasons.  First,
4     the whole case is premised on the front label of the product.
5     Again, there's nothing on the front label that addresses, you
6     know, whether the ingredients are naturally or artificially
7     sourced.  Now, it is true that the ingredients list identifies
8     natural flavors.  But, again, plaintiff doesn't say he relied
9     on that.
10           But regardless, the entire basis of the claim that the
11    product contains artificial flavors is this purported GC-MS
12    testing.  Now, your Honor's familiar with our brief.  We've
13    highlighted the slew of issues with the testing.  Oddly enough,
14    you know, that testing was -- in the other complaints that
15    we've seen, plaintiff did attach those results, but for some
16    reason, those test results weren't attached here.  So we have
17    no ability to attack what was done in underlying procedures.
18    But the reality is the conclusion, even if you accept all of
19    these allegations and the findings from the test results, that
20    there was this added vanillin, that there was Maltol, and that
21    there was Piperonal.  And, your Honor, there's a leap in logic
22    there where, even if you assume that those components were
23    found in the product, plaintiff just jumps over and concludes
24    that those things were sourced artificially, when his own
25    allegations -- cited in the complaint -- all of those confirm
```

L34LBUDO

1    that these things can be sourced naturally.  And there's no

2    analysis, no support suggested for plaintiff to get to that

3    conclusion, that these things are automatically artificial.

4    And for that reason as well, that should be rejected.

5              So I'll stop there, your Honor.  And I would obviously

6    like to reserve some time to address your Honor's questions and

7    respond to Mr. Sheehan.

8              THE COURT:  Okay.  Mr. Sheehan, I'll hear from you.

9              MR. SHEEHAN:  Spencer Sheehan, for the plaintiff.

10   Thank you, your Honor.

11             And thank you, Mr. Kaneko.

12             As the plaintiff, we don't have much to say because we

13   believe that the amended complaint and the opposition to

14   defendant's motion succinctly describe the issues here.  This

15   case does involve a picture of a vanilla bean and the vanilla

16   flower on the front of the label, which plaintiff alleges

17   causes consumers to believe the product contains a non-de

18   minimis amount of vanilla.

19             The second thing in addition to the allegations that

20   the product allegedly does not contain much vanilla is that it

21   also contains the exact opposite, artificial vanilla.

22   Defendant has stated in its brief and in its argument today

23   that there's no representation -- excuse me if I'm paraphrasing

24   incorrectly -- but that the front label makes no representation

25   beyond the words "vanilla" and the "vanilla bean."  But that

L34LBUDO

1  specific absence or omission of representation of the

2  artificial flavors that the amended complaint alleges are, in

3  fact, a representation, because the presence of artificial

4  flavors is something that consumers are entitled to know about

5  when they buy a product, and it's why many products, when we go

6  to the store, they'll have -- maybe in small letters it will

7  say "artificially flavored."  Or it might even say "with other

8  natural flavors" or just "naturally flavored."  Here, we have

9  no --

10         THE COURT:  Counsel, is it your contention that

11  whenever a company advertises that its product is flavored a

12  particular way -- mint-flavored chewing gum -- that if that

13  flavor is derived artificially, it has to use the word

14  "artificial"?

15         MR. SHEEHAN:  Mint-flavored chewing gum that's

16  flavored with mint?  No, that does not have to use --

17         THE COURT:  No.  I understand that.  But my question

18  to you is whether any time a company describes a flavor, it

19  also has to add whether that flavor is artificial, if it is in

20  fact artificial.

21         MR. SHEEHAN:  Yes, your Honor.  That is my

22  understanding of the requirements.

23         THE COURT:  Maybe for the FDA.  But to a reasonable

24  consumer?

25         MR. SHEEHAN:  Well, your Honor, I think that whether

L34LBUDO

1    or not, you know, the consumers want to consume artificial

2    flavors -- now maybe in the context of a gum, that might be

3    different, but as the amended complaint alleges, many consumers

4    in increasing number seek to avoid artificial flavors.  So I

5    guess --

6            THE COURT:  I can understand that if, for example, you

7    had a smoothie and you said as to the smoothie that it's a

8    blueberry, banana, peach smoothie, that a consumer might,

9    seeing the word "blueberry," understands that that is natural

10   blueberry.

11           But with an energy drink, can you say the same thing,

12   and why would you say the same thing?

13           MR. SHEEHAN:  Thank you, your Honor.

14           Well, your Honor is correct in pointing out potential

15   distinctions between a smoothie made with fruits and natural

16   fruits and an energy drink.  However, this is not an energy

17   drink that is like the typical energy drinks that, you know,

18   defendant might make.  Oftentimes we think of an energy drink

19   we think of -- at least I think of a Red Bull drink, which has

20   a sort of medicinal type taste, that's syrupy.  Here, this is

21   an energy drink that is based on coffee, which is not some

22   laboratory concoction of a typical energy drink.  It's coffee,

23   espresso, and vanilla cream as the characterizing flavor.

24           So in the context of energy drinks, if this was, let's

25   say one of these other energy drinks that are out there -- and

L34LBUDO

1    even the ones that defendant makes, that have sort of fanciful

2    names and, you know, descriptions and color patterns that sort

3    of are really not connected to any actual ingredients, this is

4    a more subdued product, which I think is part of the reason for

5    its success because it's based on coffee, which is something

6    that, you know, consumers are familiar with.  It's not based on

7    a chemical cocktail or, you know, a mix of syrups and pumped

8    with caffeine.  So I think that there's somewhat of a

9    distinction there, although your Honor makes a good point.

10          THE COURT:  So, why would it be important from your

11   perspective for a reasonable consumer to know that there are

12   small amounts of vanilla from vanilla bean and that much of the

13   flavor comes from other sources?  And let's assume that it's

14   from artificial sources.

15          MR. SHEEHAN:  The plaintiff --

16          THE COURT:  Because of the medicinal value of vanilla

17   from the vanilla beans?  Or why does anybody care?

18          MR. SHEEHAN:  Thank you, your Honor.

19          It's because, one, vanilla tastes different than the

20   artificial vanilla flavor replacements; two, it's because, as

21   the amended complaint alleges, the product is sold for a higher

22   price because it does not disclose the presence of artificial

23   flavors; and, three, people care because they want to get what

24   they're promised.  And I understand some people might not care,

25   but the amended complaint alleges that it's material.  And, of

L34LBUDO

1    course, your Honor is free, you know, to -- or any court is

2    free to decide that it's not material.  So I mean, the

3    plaintiff can only argue that it was material to the plaintiff

4    and believes it's something material to consumers.

5              THE COURT:  Did you allege in your complaint that,

6    from the plaintiff's perspective, the flavor was worse or that

7    the reasonable consumer was deceived as to flavor?

8              MR. SHEEHAN:  That they were deceived?

9              THE COURT:  That they were deceived as to flavor.

10             MR. SHEEHAN:  Right.  I understand.

11             That may not be in the complaint, your Honor, so I

12   understand the Court's reluctance to consider that, although I

13   would say that it is something -- I don't want to say

14   self-explanatory that vanilla is different than artificial

15   vanilla, but I don't see that argument specifically made in

16   this complaint.  I don't want to hold the Court up while I look

17   through it, so --

18             THE COURT:  Let me ask you another question about the

19   can.

20             MR. SHEEHAN:  Sure.

21             THE COURT:  There's a picture on the can of what looks

22   like a cup of hot coffee.  Is it your contention that a

23   reasonable consumer would think that within this can there is a

24   cup of hot coffee?

25             MR. SHEEHAN:  Your Honor, a reasonable consumer would

L34LBUDO

1  purchase this item from a cooler or, you know, a refrigerator,

2  so I don't know how it's possible.  I think it's clear that the

3  product is described as "espresso triple shot."  And whether or

4  not that is, in fact, a cup of coffee on the front or what

5  looks to be perhaps a mini espresso shot -- I know the product

6  talks with the romantic language that opposing counsel

7  described -- I believe then that that cup would be a cup of

8  espresso, and the fact that the product is purchased, they're

9  removed from a refrigerator, should dispel.  I don't know who

10  would think something coming from a refrigerator would be a cup

11  of hot coffee.  It's cold.  The beverage is cold when you buy

12  it because it's refrigerated.

13          THE COURT:  Okay.  So then if that's the case, isn't

14  it reasonable to assume -- isn't the only reasonable inference

15  from the pictures that what they are trying to convey is the

16  effect that this drink will have on somebody, and not literally

17  to convey that there is a cup of coffee or a cup of espresso

18  inside with, you know, real vanilla and real coffee beans?

19  It's just trying to convey that this is going to give you the

20  energy and have the effect -- a Monster effect -- of drinking a

21  triple espresso.

22          MR. SHEEHAN:  Thank you, your Honor.

23          Those are good points.  Plaintiff and I would say --

24          THE COURT:  But if I accept them, aren't they fatal to

25  you?

L34LBUDO

1          MR. SHEEHAN:  If your Honor accepts that the product

2     does not contain espresso.  But I would say that the product

3     does contain espresso because I know it does from looking at

4     the ingredient list where it says "brewed imported espresso

5     coffee."  I think that, you know, espresso as a type of coffee,

6     I guess, and it's a highly concentrated kind.  And the product

7     does contain espresso, which is true to the front of the label

8     and the picture of the espresso cup.  And it would also hold

9     that the product would contain enough vanilla.  The product

10    ingredient list also says "cream."  So there's cream.  So

11    that's a reasonable assumption.  But this case is about the

12    presence of vanilla and, you know, where the product has real

13    espresso, where it has real cream, enough that it doesn't need

14    to be supplemented with other ingredients, the plaintiff

15    alleges the product should have real vanilla, at least enough

16    to impart, you know, vanilla character to the product and not

17    have artificial flavors to produce the vanilla taste.

18          THE COURT:  Okay.  Why don't you go on with the rest

19    of your argument.

20          MR. SHEEHAN:  Okay.  Thank you.

21          Well, there were a couple of other points that I wish

22    to address.  First is the artificial flavors, the Maltol

23    Piperonal.  Defendant is correct that the testing results and

24    inferences don't prove that these ingredients -- or these

25    components are artificial.  We do rely on FDA regulations that

L34LBUDO

1   describe these flavored compounds as artificial.  However, at

2   the pleading stage, without discovery, we believe that we've

3   met the burden of going forward with the claim that these are

4   artificial flavors.  If defendant wanted to, it could have

5   submitted declarations or affidavits about the source of these

6   other flavors.

7          One other thing.  Defendant stated that the product

8   contains real vanilla, that even if, as plaintiff alleges, it's

9   a de minimis amount, it's still not misleading.  Plaintiff

10  relies on *Mantikas v. Kellogg* and believes that the presence of

11  a small amount of an ingredient in a product is not sufficient

12  to overcome otherwise misleading front-label claims.

13         The last thing is the case in *Pichardo v. OWUN*.  It is

14  correct, as defendant noted, that this case came to a different

15  conclusion.  Are there reasons for that?  Is there some

16  explanation that I can give the Court why somehow this case

17  should be different?  I don't think so.  You know, cases are

18  different.  Not all are the same.  We try to find the common

19  principles and threads through each one, being respectful, of

20  course, always of the judicial process and the courts.  But I

21  really don't have much to add about that, although I think that

22  the fact that, while the OWUN beverage was a smoothie, it did

23  not have sort of as natural a character as this product does.

24  That product was I think, you know, some sort of non-dairy

25  protein beverage, whereas, you know, this is clearly a -- you

L34LBUDO

1    know, mostly -- or expected to be a natural product.  It's --

2          THE COURT:  Where do I see that in your complaint?  I

3    agree that if a reasonable consumer could understand this to be

4    a natural product, that would help your cause.  But tell me

5    where I get that from, because looking at the can, one could

6    assume that this is a completely artificial product intended

7    just to give somebody a caffeine high.

8          MR. SHEEHAN:  Your Honor makes an excellent point.

9    You know, I guess --

10         THE COURT:  Help me with -- I mean, you said to me

11   that a consumer would understand this as a natural product.  If

12   that's in your complaint, I'd like to know it, because it's --

13   it may make a difference.

14         MR. SHEEHAN:  That is correct, your Honor.  And I'm

15   not going to tell the Court that it's there specifically.  I'm

16   going to take a look.  You know, I don't really -- at least I

17   don't recall that argument being in there.  So, you know,

18   that's maybe something that wasn't pleaded at the time.  But

19   that's obviously -- you know, maybe it wasn't something that

20   was considered and that was a -- I guess it was not expected

21   that that would be relevant.  And to the extent that your Honor

22   would grant defendant's motion, we would request a leave of

23   Court to add those other allegations, of course, to the extent

24   that would even be worthwhile.  We think it would.  It is

25   something that I believe the material.  And I wish I could

L34LBUDO

1    think of everything.  And even though it's just one can,

2    there's just so much you think that you can get out of it.  And

3    I guess, we have to think a little bit wider and broader.

4              THE COURT:  I can tell both parties that I've spent a

5    fair amount of time trying to study the case.

6              All right.  Mr. Sheehan, why don't you bring it to a

7    close, and then I'll turn back to your adversary if there's

8    anything else I should know.

9              MR. SHEEHAN:  Thank you, your Honor.

10             And the last and final thing is that, you know, this

11   is a motion-to-dismiss stage.  We're not, you know, at summary

12   judgment.  There's been no evidence offered really.  And it's

13   not something that has to be one way or the other.  This is

14   something that, well, you know, could it mislead consumers?

15   And is that plausible?  I think it's plausible.  And whether or

16   not it's clear to us, as people who have studied this, whether

17   that would be misleading, it's a different story than the

18   standard that's applied on the motion-to-dismiss stage.

19             So that's all I have, your Honor.  Thank you.

20             THE COURT:  Well, let me ask you a couple of

21   questions.

22             Are you familiar with Judge Woods' decision in the

23   *Honey Graham* crackers case?

24             MR. SHEEHAN:  Yes.  That was a case I did, your Honor.

25             THE COURT:  Okay.  So you know that in that case he

L34LBUDO

1    drew something of a distinction between honey where the honey

2    flavor is commonly known to really only come from natural honey

3    and vanilla -- or something other than honey, where the words

4    don't necessarily, in his view, and supported by the complaint,

5    connote a necessary ingredient.

6           How do you address that?  I mean, isn't it the point

7    that when people see the word "vanilla," it is commonly

8    understood to be a flavor?

9           MR. SHEEHAN:  Yes.  Thank you.

10          And, you know, Judge Woods makes very accurate and

11   very good points, obviously.  And I would say that, yes,

12   vanilla is understood to be a flavor.  But where the vanilla is

13   presented with pictures of the vanilla bean, and without any

14   qualifying language such as "artificially flavored," that's

15   something that consumers are aware of.  They look and they see

16   it doesn't say artificially flavored.  They see the picture of

17   a vanilla bean and the vanilla flower.  The fact that vanilla

18   is not technically a nutritive ingredient doesn't take away

19   from the fact that consumers are entitled and they want a

20   product that comes from the ingredient.  It comes from the

21   vanilla bean, vanilla extract, and you know it is just as much

22   an ingredient as honey is an ingredient.  The fact that its

23   caloric significance might be less because, yes, I agree it's a

24   flavoring.  But it's also an ingredient.  And I believe that

25   that is sufficient to distinguish this in addition to the

L34LBUDO

1    absence of any disclosure that the product has artificial

2    vanilla flavor as opposed to natural vanilla flavor.

3         THE COURT:  Okay.  Let me turn to your adversary.

4    Thank you very much.

5         MR. SHEEHAN:  Thank you.

6         MR. KANEKO:  Thank you, your Honor.  Naoki Kaneko

7    again for Monster.

8         THE COURT:  Mr. Kaneko, let me ask you my questions

9    studying this can.

10        If it is correct that the product literally has

11   espresso in it -- that is, confirmed be by the ingredient

12   list -- and if it's also correct, as I think you said before,

13   that it's got the equivalent of three shots of espresso, as

14   represented on the right side of the can where it says "triple

15   shot," and if it's also correct that it has cream in it, as

16   confirmed by the ingredient list, why isn't it plausible that a

17   reasonable consumer seeing the word "vanilla," seeing the

18   flower, seeing also the coffee beans, would understand that

19   it's got more than a de minimis amount of vanilla from the

20   vanilla bean?

21        MR. KANEKO:  Well, again, your Honor, remember, this

22   is a coffee product.  And so the only quantification in terms

23   of the descriptors that are being used here is the triple.

24   Yes, there's a triple shot here; there are three shots of

25   espresso.  But from this label, there's no representation as to

L34LBUDO

1    how much vanilla is in the product.  Now --

2            THE COURT:  But, come on.  That argument is the

3    argument that was rejected in *Mantikas*.  If this product

4    actually said "made with real vanilla" and there was just a

5    trace amount of vanilla, you wouldn't be standing in front of

6    me and saying the label is not misleading.

7            MR. KANEKO:  Your Honor, that's correct.  There's a

8    difference between saying "made with vanilla beans or vanilla

9    extract" as opposed to labeling this product as a "vanilla

10   cream coffee-flavored beverage."

11           THE COURT:  That's my question, is it clearly can't be

12   the law that the use of the words "made with" are magic and

13   that you only understand an item to be an ingredient if the

14   words "made with" are included.  That's the point that Judge

15   Woods was making when he showed the honey pot and the stick.

16   And my question to you is:

17           Why isn't a use of the flower, along with all the

18   other things on the can, equivalent to saying "made with" what

19   comes from that plant or the bean attached to that plant?

20           MR. KANEKO:  Again, your Honor, I think the point is

21   that there is actually -- so in this situation, even if you had

22   "made with" -- "made with" isn't -- I used that because it's an

23   easy call, right.  It's an easy call to say if something is

24   made with, then a reasonable consumer would expect that that

25   product had whatever you're representing it was made with.  But

L34LBUDO

1    even "made with" isn't all determinative, your Honor.  When

2    you're thinking about -- for example, there's the *Sarr* case,

3    and those were mashed potatoes.  And I think the allegation

4    there was -- analogizing to here, the claim there was that the

5    representation that those mashed potatoes were made with real

6    butter, that that somehow meant that there were no other fats

7    in the product.  And the court said no, no, no, that's not

8    case.  This thing has real butter in it.  You can't add an

9    additional meaning to suggest that, well, okay, this thing has

10   made butter in it, that means it doesn't have any other fat.

11          I think the other example, there was the "made with

12   honey" case.  I think it was the Kennedy case, where there was

13   a "made with honey" representation, and along the same lines,

14   the claim was, well, you said "made with honey," that meant

15   there were no other sweeteners in this product.  And the court

16   said no.  They rejected that claim as well and said no, this

17   thing was made with honey, it had some honey in there, there's

18   nothing about the label that suggests that it didn't have these

19   other sweeteners; likewise, it didn't have these other fats in

20   it.

21          And I think that's the distinction here, your Honor.

22   Here, we have -- I would agree, it's not necessarily "made

23   with" that defines the line, but it's that representation that

24   this product contains.  Remember, it's the entire context of

25   the label here.  When I walk into the store and I'm looking for

L34LBUDO

1    -- in this case, your Honor mentioned it, it's a reasonable

2    consumer might be looking for maybe a coffee product, maybe an

3    energy drink.  They're not looking for a can of vanilla, a can

4    that contains a hundred percent vanilla.  They're looking for a

5    coffee product or an energy drink.  And when they're

6    distinguishing between those flavors, here it's the vanilla

7    cream flavor that's standing out, not the representation that,

8    hey, this product has X amount of vanilla bean in it.  It's:

9    Does it taste like vanilla?  The plaintiff himself

10   acknowledges, yes, it does, it tastes like vanilla.

11        So a reasonable consumer who buys this product, gets

12   what they bargained for.  They were looking for a coffee

13   vanilla-cream-flavored product.  That's what they got.  They

14   were looking for a product that was naturally flavored.  The

15   ingredients are naturally flavored.

16        Now, just as an aside, your Honor, this notion about

17   the artificial ingredients, under the FDA regs, when a product

18   uses a descriptor of vanilla as the characterizing label, if

19   there are artificial flavors, then that vanilla representation

20   on the front would have to be accompanied by an artificial

21   disclaimer, "artificially flavored," or something along those

22   lines.  But the reason that's not in there is because these

23   flavors are, in fact, natural.  And so the labels do comply

24   with the FDA regs.  This whole thing notion about, hey, these

25   things are artificial, plaintiff's counsel has acknowledged

L34LBUDO

1   they don't know.  It's all speculation.  They have a test that

2   identified three components.  They acknowledge here that the

3   components -- their complaint acknowledges it.  The FDA regs

4   acknowledge it -- those things can't be sourced either

5   artificially or naturally.  And they don't know.  They just

6   make the leap and logic assumption that it is artificial, and

7   that's not enough.  And the same exact testing, the same exact

8   logic was rejected in the last three cases in *Berreto*, *Wynn* and

9   *Twohig*.  The exact same logic, the exact same testing was

10  cited, the exact same components at issue was cited.  And the

11  courts rejected that because it was just speculation.

12          THE COURT:  So, counsel, would your argument be the

13  same if this can actually said "made with real vanilla"?

14          MR. KANEKO:  If it said "made with real vanilla," it

15  would be a different story, your Honor.  Like I said, this

16  product does contain vanilla.  The question then is:  What does

17  that mean in terms of how much?

18          Again, though, in that situation, your Honor, I would

19  point back to the plaintiff's own allegation, that 98 percent

20  of commercial vanillin isn't sourced from natural vanillin.

21  And I think that's really the underlying issue here.  They're

22  operating under this assumption that vanilla flavoring is

23  solely derived from vanilla beans.  Yet, Judge Stanton pointed

24  out in the *Steele* case that natural vanilla or vanilla

25  flavoring is not just derived from vanilla beans.  There are

L34LBUDO

1    many, many different sources of natural vanilla flavoring.  And

2    that's what we're dealing with here, your Honor.  When you talk

3    about how much vanilla extract, it's really just -- it's the

4    assumption that's incorrect here.  And their own pleadings

5    acknowledge that, your Honor, that 98 percent -- the reality is

6    the majority of vanilla flavoring isn't sourced from vanilla

7    beans.  Here, though, we do have a product that does have some

8    vanilla bean extract in there.  Plaintiff acknowledges it.  And

9    it's also sourced with other natural flavors.

10           Now, again, this product is not just a can of vanilla.

11   We have espresso, we have cream.  So those natural flavors, the

12   notion that it's just applicable to vanilla, you know, it can't

13   be looked at in that vacuum.  He's ignoring the fact that,

14   okay, there's coffee in this product, there's cream, there's

15   sugar, there's other things in there.  So natural flavoring, it

16   may not line up.  And that's the whole point.  With their

17   testing, they compared an Espresso Monster with a purported

18   sample of just pure vanilla extract.  Well, they don't know --

19   that means they have no basis for knowing what should or

20   shouldn't be in Espresso Monster.

21           Again, I'm repeating myself, but one thing I would

22   point out is --

23           THE COURT:  You are.  Why don't you bring it to a

24   close.

25           MR. KANEKO:  And so ultimately, your Honor, as we've

L34LBUDO

| | |
|---|---|
| 1 | addressed in our brief, the reality is if you find and you |
| 2 | agree with our position that, look, this is a flavoring claim, |
| 3 | there's no representation about how much vanilla bean was |
| 4 | actually in the product, there's no representation -- and then |
| 5 | you disregard the fact that there really is no artificial |
| 6 | flavors in there and all of the allegations to that effect are |
| 7 | based on pure speculation, then all of the claims should be |
| 8 | dismissed for those grounds. |
| 9 |     Now, plaintiff can take an issue with the listing of |
| 10 | natural flavors on the ingredients list.  You know, we |
| 11 | highlighted this issue in our brief.  But the FDA regs, there's |
| 12 | nothing wrong with that, and they specifically allow for |
| 13 | companies, for food and beverage makers to identify natural |
| 14 | flavors as natural flavors without specifically identifying |
| 15 | every single flavoring source.  Now, plaintiffs are asking and |
| 16 | suggesting that that's what Monster is required to do, and |
| 17 | that's not the law.  And so to that extent, those claims should |
| 18 | be preempted. |
| 19 |     Now, there's a whole slew of common law claims. |
| 20 | Again, those can be dismissed for the same reasons the GBL |
| 21 | claims are dismissed.  But I'm happy to address any |
| 22 | deficiencies.  We've highlighted those in our brief.  And with |
| 23 | that, I'll submit, your Honor. |
| 24 |     THE COURT:  All right.  The argument's been very |
| 25 | helpful.  Thank you to both of you. |

L34LBUDO

1              Defense counsel, why don't you stay on the phone and

2      order a copy of the transcript on an expedited basis.  The

3      Court will take it under submission.  And I'll get back to you

4      as soon as I can with a decision.  Thank you.

5              MR. KANEKO:  Thank you, your Honor.

6              MR. SHEEHAN:  Thank you, your Honor.

7                              * * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25